**Joy Niday COLSON, Appellant,**

v.

**Paul GROHMAN, Mike Hogg, Jack Roberts, and Stella Roberts, Appellees.**

**No. 01–98–00992–CV.**

Court of Appeals of Texas, Houston (1st Dist.).

May 18, 2000.

David M. Feldman, Richard Alan Morris, Sheila Haddock, Houston, for appellant.

Mark A. Carrigan, Barry Abrams, Maxine D. Goodman, Houston, for appellee.

Panel consists of Justices O'CONNOR, WILSON, and ANDELL.

## OPINION

ERIC ANDELL, Justice.

We are asked to decide if the trial court erred in rendering summary judgment for appellees Paul Grohman, Mike Hogg, Jack Roberts, and Stella Roberts on Joy Niday Colson's claims for defamation and intentional infliction of emotional distress. We affirm.

### Procedural History

Colson's initial suit for defamation was filed against various parties, including Jack and Stella Roberts, on October 4, 1993. Hogg was added as a defendant in August 1994, and Grohman was added as a defendant in December 1994. Colson's seventh amended petition alleged claims under 42 U.S.C. § 1983 for violations of her rights under the First and Fourteenth Amendments. The defendants removed the case to United States District Court for the Southern District of Texas.

The United States District Court granted appellees' motions for summary judgment on Colson's constitutional claims, and remanded the remaining state law claims to the state court. The District Court's rendition of summary judgment on the federal claims was upheld by the Fifth Circuit in *Colson v. Grohman,* 174 F.3d 498 (5th Cir.1999). In a general order on June 30, 1998, the trial court granted appellees' motions for summary judgment dismissing Colson's claims for defamation and intentional infliction of emotional distress.

### Facts

The parties to this action are: (1) Joy Colson, a Pearland City Councilwoman whose husband was a Pearland police officer; (2) Mike Hogg, the Pearland Police Chief; (3) Paul Grohman, the Pearland City Manager; and (4) Jack and Stella Roberts, two Pearland citizens.

The trouble among the parties began in the late summer or early fall of 1992, when Hogg presented the City Council with his proposed 1993 budget for the Pearland Police Department. Hogg's budget included a pay plan for police officers, Colson's husband among them. Colson offered an alternative pay plan that Hogg and Grohman opposed. Colson contends Hogg began using the powers of his office to retaliate against her for proposing a different plan. This initial dispute triggered a bitter, complex, ongoing battle among the parties, replete with claims and counterclaims of improper behavior.

Hogg's first act, in January 1993, was to submit a "confidential investigation" memorandum to Brazoria County District Attorney Jim Mapel, detailing numerous in-

stances in which certain Pearland City Council members, including Colson, allegedly violated the Texas Open Meetings Act ("TOMA") and conflict-of-interest statutes. Colson claims that over the next few months, as Hogg became increasingly frustrated by her positions on police department issues, he retaliated against her by making additional false criminal accusations.

Grohman contends that between February and June 1993, Colson and her husband repeatedly told him "Hogg has got to go." Grohman warned Hogg that Council members Colson, Weber, and Miller wanted to fire Hogg, even though it was not within the power of the Council to do so. A public meeting of the council was called for the express purpose of evaluating Hogg's performance. At that meeting, Hogg read a prepared statement suggesting the Council had violated TOMA and the City Charter by deciding at a private retreat not to approve any raises for police officers for fiscal year 1994.

In May 1993, Hogg prepared a confidential report for Tom Selleck, the district attorney Mapel had assigned to handle Hogg's accusations. In this report, Hogg alleged Colson had violated TOMA and the state nepotism statute. Two weeks later, Hogg delivered an update to Selleck accusing Colson of improperly proposing that the Council reconsider its earlier decision to discontinue disability coverage for city employees; he claimed Colson did this in an effort to benefit her husband, who had contracted a disabling illness. Selleck told Hogg that if Hogg could prove three TOMA violations had occurred within the past 12 months, Selleck would take the allegations to the Brazoria County grand jury.

Selleck and Mapel discussed their concern that Hogg was attempting to use the District Attorney's Office in a personal battle with Colson and other Council members. They concluded there was no basis for bringing criminal charges against the Council members, and informed Hogg of their decision in June 1993. Mapel told Hogg the Council members had committed "technical violations" of TOMA, but that the violations were minor and that the District Attorney's Office would not pursue the matter.

The next day, Hogg met with Selleck and Brazoria County Investigator John Blankenship, and gave them a chart of violations Council members had allegedly committed between July 1, 1992 and July 12, 1993. The chart indicated Colson had violated TOMA and the state nepotism statute by participating in illegal meetings and voting on a matter directly affecting her husband. In August 1993, a grand jury was convened, at which Grohman and Hogg presented their allegations against certain Council members. The Brazoria County Grand Jury refused to issue indictments; instead, they chose to send letters to Council members warning them to hold their meetings in compliance with TOMA.

While the events culminating in the presentation of Hogg's accusations to the grand jury were occurring, the Pearland Council evaluated Grohman in a closed executive session in July 1993. Colson and at least one other Council member rated Grohman's performance as "poor." Colson additionally criticized Grohman for "managing with intimidation" and awarding salary increases without Council approval. Two Council members asked the Council to consider terminating Grohman at their next meeting. Colson alleges that Grohman was furious, and, as a result, asked Hogg to prepare the first set of recall petitions.[1] The petitions were circulated

---

1. The City Charter for Pearland gives the people the power to recall city officials from office. To invoke the process, a specified number of the electorate must file a recall petition, alleging one or more specified "grounds" for recall. Five days after a recall petition has been filed, the City Secretary must either certify it if it is in proper form, or return it to the petitioners for correction. If it is then certified, the City Secretary must present the petition to the Council. Within five days after a petition has been presented,

during the July 26 Council meeting held expressly to consider dismissing Grohman; a divided Council voted to revisit the issue of Grohman's employment in 90 days.

Grohman contends he did not initiate the recall petitions. He contends he was approached by various citizens asking him how to recall city council members. Grohman and Hogg both contend Grohman simply asked Hogg to prepare a "form" of what the recall petitions should look like. Grohman claims he asked Hogg to do this because he knew Hogg had extensive experience drafting criminal complaints and was familiar with the issues being raised. The first recall petition concerning Colson was as follows:

> Directed to the City Council in and for the City of Pearland Texas for the specific purpose of demanding the recall of Joy Colson, who is a duly elected Council member of the City Council in and for the City of Pearland, located in Brazoria and Harris County Texas. Persuant [sic] to Section 6.02 of the City of Pearland Charter, the below signed qualified voters do hereby demand the recall of Council Member Colson on the grounds of malfeasance in Office.

> Specifically we allege that Ms. Colson, while acting as a city council member, did violate The City of Pearland Charter, Sections 8.06 and 8.07 and Chapter 171(1)d, of the Local Government Code thereby violating a law relating to her office as a Council member, thus rendering her actions in violation of Section 39.01 of the State Penal Code titled Official Misconduct, the same being a Class A Misdemeanor. We further allege that Ms. Colson violated these sections by deciding on the final budget of the police department for fiscal year 94 without conducting the required Public Hearing and posting the required Public notice, further that on March 8, 1993 she partic-

ipated in a vote that had a direct effect on her husband's position in the Police Department. We further allege that she regularly enters into deliberations concerning matters which have a direct impact on her husband.

Hogg delivered a copy of the Colson recall petition to Grohman and another city employee, Paul Dillon. Grohman then delivered a copy to Stella Roberts, a private citizen of Pearland and herself a former Council member. Grohman and Stella Roberts prepared a set of instructions to accompany the petitions. These instructions stated Colson was being investigated by the District Attorney's Office and a grand jury for possible criminal violations, and accused her of: (1) having shown a disregard for the laws governing Pearland; (2) having numerous allegations lodged against her for acting illegally outside public meetings; (3) letting personal vendettas override public interest by persecuting the police chief, city manager, and other city employees; and (4) self-dealing. Colson contends all of these allegations were false. After receiving the petitions in September 1993, then-City Secretary Pat Jones determined the signatures on the petitions lacked the necessary voter registration numbers. Stella Roberts picked up the petitions to correct them; Grohman directed city employees to assist Stella Roberts and her husband, Jack, to correct the petitions and help Jones certify them. Grohman also ordered Jones to provide the Robertses with a copy of the city voter registration list so they could more easily identify the registration numbers.

The Robertses returned the corrected petitions on September 12. Jones and the City Attorney determined, however, many of the signatures were invalid because the petitions were not signed by the affiants claiming to have circulated them, as required by the Pearland Charter. Groh-

---

the accused official may request "that a public hearing be held to permit him or her to present facts pertinent to the charges specified in the recall petition," and, within 15

days of such a request, the Council must order a recall election wherein the voters decide if the accused official should be removed from office.

man telephoned the affiants, including Jack Roberts, and asked them to come to the City Secretary's office to sign the petitions they had circulated. Jones claims Grohman pressured her to certify the petitions without verifying the signatures, and to complete the certification in time for a Council meeting on September 13. Ultimately, Jones refused to certify the petitions.

The Robertses organized the circulation of a second set of recall petitions containing the same accusations against Colson. There is no evidence Grohman or Hogg was involved in drafting or publishing the second set. The new recall petitions contained allegations of incompetence, and stated Colson (1) committed malfeasance in office by regularly voting on matters directly affecting the compensation afforded her husband as a member of Pearland Police Department; (2) approved the 1994 PPD budget in violation of TOMA; and (3) effectively relegated her investigation and consideration of certain actions to be taken by the Council to two other Council members, voting according to their direction or position.

In October 1993, Colson filed suit for defamation against the Robertses in state district court, and sought to bar a recall election and continued publication of the allegedly false criminal allegations against her. The court enjoined a recall election. The court determined the petitions did not give Colson adequate notice of the charges against her because they were not specific enough. No recall election was ever held.

During and after the circulation of the first set of recall petitions, Grohman and Hogg continued to report the Council's alleged criminal activity to the District Attorney's Office. In early November 1993, Hogg prepared a presentation on this for Texas Ranger Sergeant Joe Haralson. After the district court enjoined the recall election, Stella Roberts phoned Hogg to report she saw Colson talking in the courtroom about matters that might have been pending before the Council; Hogg prepared a report for law enforcement authorities setting out Roberts's allegations.

Grohman and Hogg continued to ask the District Attorney's Office to bring charges against Colson. Late in November 1993, Grohman complained to Mapel that Council members were retaliating against him, and told Mapel he understood that a grand jury would follow Mapel's recommendation. Mapel denied this. Grohman also said an indictment for retaliation or coercion was the only thing that would make Colson and the other Council members "run the other way." Hogg also forwarded to Mapel a copy of a letter criticizing Colson from Reverend Scarborough of the First Baptist Church of Pearland. Finally, in December 1993, Hogg, Selleck, Investigator Blankenship and Texas Ranger Joe Haralson met in Blankenship's office at the Brazoria County District Attorney's Office. Hogg asked Selleck to bring criminal retaliation or coercion charges against Colson because she had voted to have Grohman investigated. Selleck told Hogg he did not have sufficient grounds to bring such charges. Several days after this meeting, Hogg told Selleck that if he could indict Colson and two other Council members, Hogg would guarantee him 1800 votes if Selleck ran to succeed Mapel as District Attorney in the upcoming election.

After this meeting, according to Colson, Selleck and Blankenship concluded Hogg had lost his focus as an impartial and objective criminal investigator and forgotten his mission as Pearland's chief law enforcement officer. They also discussed, but rejected, bringing bribery charges against Hogg.

In January 1994, Hogg again testified before the grand jury. Selleck warned Hogg not to present allegations of retaliation and coercion of a public servant, because the elements of these offenses could not be met, but to go ahead with the other allegations. Following Hogg's presentation, the grand jury declined to indict Colson, but instructed Selleck to draft letters

to the Council members informing them of the alleged violations of TOMA and suggesting they consult the City Attorney if they had questions in the future.

In February 1994, Hogg wrote to Texas Ranger Haralson, asking him to investigate Selleck for his failure to take action on Hogg's allegations. In March 1994, Assistant District Attorney Danette Holcombe informed Grohman the grand jury had considered his retaliation and coercion charges and brought back a no-bill on both. Holcombe told Grohman several members of the Brazoria County District Attorney's Office had reviewed the case and had not found anyone had retaliated against or coerced Grohman.

Finally, in April 1994, just two weeks before the May 1994 election in which Colson was running for reelection, Hogg prepared, on city time and using city property, a lengthy report on PPD stationery entitled "Pearland Pandemonium," or "It's OK, Everybody Does It." He directed the City Secretary's Office to forward a copy to each Council member and he put a copy in the Pearland library. Hogg claimed the purpose of the report was to give the Council an accounting of events as it considered Grohman's employment status. Nevertheless, Hogg admitted he had it placed in the library because he "wanted it in the public forum." Hogg represents the report to be a complete chronology of events relating to criminal investigations of all Council members, despite its focus on Colson and fellow Council members Frank and Miller. Hogg attributed his failure to include allegations against any of the other Council members as "due to [his] style of writing." Colson added Hogg to her defamation suit in November 1994, and added Grohman in December 1994, adding a claim for intentional infliction of emotional distress.

### Standards of Review

The Robertses' motion for summary judgment was a general summary judgment motion. Although Grohman and Hogg assert their motion was a no-evidence summary judgment motion, it appears to be a hybrid, with elements of a general, as well as a no-evidence, summary judgment motion.

### 1. Summary Judgment

A general summary judgment is proper only when the movant establishes there is no genuine issue of material fact and it is entitled to judgment as a matter of law. *Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 548 (Tex.1985). Because this is an appeal of a summary judgment involving only a legal issue, we assume the facts pleaded by Colson are true. *Natividad v. Alexsis, Inc.*, 875 S.W.2d 695, 699 (Tex.1994); *Maranatha Temple, Inc. v. Enter. Prod. Co.*, 893 S.W.2d 92, 98 (Tex. App.-Houston [1st Dist.] 1994, writ denied).

Properly raised, a no-evidence summary judgment motion places the burden on the nonmovant to produce evidence on each challenged element of their claim or defense. *Heiser v. Eckerd Corp.*, 983 S.W.2d 313, 316 (Tex.App.—Fort Worth 1998, no pet). A no-evidence summary judgment must be affirmed if the nonmovant does not provide more than a scintilla of probative evidence to raise a genuine issue of material fact on a challenged element of her claims. *Graves v. Komet*, 982 S.W.2d 551, 553 (Tex.App.—San Antonio 1998, no pet.).

### 2. Defamation

The question of public figure and public official status is one of constitutional law for courts to decide. *Rosenblatt v. Baer*, 383 U.S. 75, 88, 86 S.Ct. 669, 677, 15 L.Ed.2d 597 (1966). The parties in this case do not dispute that as a Pearland Council member, Colson was a public official. To sustain a defamation cause of action, a public official must prove the defendant: (1) published a statement; (2) the statement published concerning the public official or public figure was defama-

tory; and (3) that the statement was made with actual malice. *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1964); *Casso v. Brand*, 776 S.W.2d 551, 554 (Tex.1989). A statement is defamatory if the words tend to injure a person's reputation, exposing the person to public hatred, contempt, ridicule, or financial injury. *Einhorn v. LaChance*, 823 S.W.2d 405, 410–11 (Tex. App.—Houston [1st Dist.] 1992, writ dism'd w.o.j.). Whether a statement is reasonably capable of a defamatory meaning is a question of law for the court. *Carr v. Brasher*, 776 S.W.2d 567, 569 (Tex. 1989). Statements may be false, abusive, and unpleasant without being defamatory. *Free v. American Home Assur. Co.*, 902 S.W.2d 51, 54 (Tex.App.—Houston [1st Dist.] 1995, no writ).

 Actual malice is a stringent culpability standard which a public figure defamation plaintiff must meet in order to recover. Public officials and public figures must establish a high degree of fault. They must prove the defendant published a defamatory falsehood with actual malice, that is, with "knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times*, 376 U.S. at 279–80, 84 S.Ct. 710, 710 (defining the actual malice standard and applying it to public officials). It is the defamation plaintiff's burden to come forward with "specific affirmative proof" establishing that the defendant "entertained serious doubts as to the truth" of the publication. *Galveston Newspapers, Inc. v. Norris*, 981 S.W.2d 797, 800 (Tex.App.—Houston [1st Dist.] 1998, pet. denied)

**3. Intentional Infliction of Emotional Distress**

 To recover for intentional infliction of emotional distress, a plaintiff must prove that: (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff emotional distress; and (4) the emotional distress suffered by the plaintiff was severe. *Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex.1993). Extreme and outrageous conduct is conduct so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. *Natividad*, 875 S.W.2d at 699. Whether a defendant's conduct may reasonably be regarded as extreme and outrageous is a question of law. *Wornick Co. v. Casas*, 856 S.W.2d 732, 734 (Tex.1993).

**Application of the Law to the Facts**

 To survive summary judgment rendered on Grohman and Hogg's no-evidence summary judgment motion on the issues of defamation and intentional infliction of emotional distress, Colson was required to provide some evidence of each element of both claims. To survive the Robertses' general summary judgment motion and the general summary judgment portions of Grohman and Hogg's motion, Colson was required to establish there is a genuine issue of material fact and that she was entitled to judgment as a matter of law. We examine the facts, which we take as true, in light of the foregoing standards.

Mapel told Hogg that technical violations of TOMA by Colson and other Council members had occurred, but that the District Attorney's Office declined to pursue the matter. Despite that decision, the District Attorney's office allowed the allegations that Colson and other Council members had violated TOMA and conflict-of-interest statutes to be brought before two separate grand jury panels in 1993 and 1994. While they declined to indict Colson and other Council members, *both* grand juries sent letters to the Council members informing them of the allegations and warning them to act in compliance of TOMA in the future. The Robertses' belief that Colson had violated the law was based on presentations to the Council, per-

sonal observations, and representations by Grohman and an attorney.

The state district court enjoined the recall election because the recall petitions were not specific enough as to the allegations being made against Colson so that she had adequate notice as to the charges against her. Without such specificity, we question whether the allegations could be considered defamatory. When we view the summary judgment evidence in the light most favorable to Colson, we conclude that the conduct she contends was defamatory amounted to no more than a "steady stream of accusations of vehement criticism that any politician must be expected to endure." *Colson v. Grohman*, 174 F.3d 498, 514 (5th Cir.1999). Moreover, other than calling the allegations false, Colson offered no evidence to show the Robertses, Hogg, or Grohman entertained any doubts about the truth of their allegations. Without such evidence, she cannot show actual malice. *See Galveston Newspapers*, 981 S.W.2d at 800.

Nor can Colson prevail on her claim for intentional infliction of emotional distress. We find Colson has produced no evidence of the severity or duration of her emotional distress. In her affidavit, Colson states that, as a result of the actions taken by Grohman and Hogg, she was forced to seek medical attention; she received prescriptions from her doctor to treat high blood pressure, anxiety attacks, and stress-related stomach problems she was experiencing for the first time. Proof of a physical injury is not necessary to recover for emotional distress. *St. Elizabeth Hosp. v. Garrard*, 730 S.W.2d 649, 653–54 (Tex.1987) (overruled by *Boyles v. Kerr*, 855 S.W.2d 593, 596 (Tex.1993) to the extent that it recognized an independent right to recover for negligently inflicted emotional distress); *Star Houston, Inc. v. Shevack*, 886 S.W.2d 414, 418 (Tex. App.-Houston [1st Dist.] 1994, *writ denied per curium*, 908 S.W.2d 462). However, Colson offered no evidence to indicate the severity her emotional distress. Without

such evidence, she cannot survive summary judgment. *See Twyman*, 855 S.W.2d at 621. In addition, we conclude the summary judgment evidence does not establish that Grohman and Hogg's conduct was "extreme and outrageous" as a matter of law. When viewed in the surrounding circumstances, Grohman and Hogg's conduct was not atrocious or beyond all possible bounds of decency. Grohman and Hogg made public allegations against Colson for possible violations of the conflict of interest statute and TOMA. These accusations were made in the context of their effort to exercise their rights as citizens of Pearland to recall a public official as guaranteed by the Pearland City Charter. Reduced to its simplest terms, Colson's claim is that the accusations made during the recall process damaged her reputation in the Pearland community. Imputing dishonesty to a public official in this time in which we live is not so outrageous and beyond all bounds of decency as to be actionable.

We overrule Colson's issue.

We affirm the summary judgment.

Justice O'Connor dissenting.

MICHOL O'CONNOR, Justice, dissenting.

I dissent. I do not believe the Robertses, Grohman, or Hogg (the defendants) established they were entitled to a summary judgment on the defamation claims. I believe Colson should be given the opportunity to present her defamation claims against them to a jury. I would reverse and remand.

The panel finds that the activities of the defendants was no more than the "steady stream of accusations of vehement criticism that any politician must be expected to endure," quoting the Fifth Circuit opinion in this case, *Colson v. Grohman*, 174 F.3d 498, 514 (5th Cir.1999). The panel takes this quote out of context. The issue before the Fifth Circuit was whether the

defendants violated Colson's First Amendment rights by misusing the criminal justice and recall processes to retaliate against her. Under that claim, Colson was required to show more than mere injury to reputation. As the Fifth Circuit said, the making of false accusations is not actionable under the First Amendment retaliation jurisprudence. *Colson*, 174 F.3d at 512. The Fifth Circuit held that Colson would have had a retaliation claim if she had ever been subjected to a recall petition. *Id.* at 513. As it was, she was voted out of office, which is not actionable as a retaliation claim.

The panel ignores statements from the Fifth Circuit opinion that do not favor its holding. For example, the Fifth Circuit found that the summary judgment evidence showed "the defendants not only criticized Colson but defamed and libeled her, presenting criminal allegations to the District Attorney's Office and the public with knowledge they were false or with reckless disregard of whether they were false or not."

### Wrong Standard of Review

The panel forgets that this is an appeal from a summary judgment. When reviewing a summary judgment, we must view the evidence in the light most favorable to the non-movant, in this case Colson. Instead, the panel ignores all evidence that favors Colson and focuses only on the evidence and inferences that favor the defendants. For example, the panel finds that the grand jury's letters to the Council that allegations were made and warning them to act in compliance with the Texas Open Meetings Act is somehow evidence that justified the defendants' belief that Colson had violated the law.

The panel ignores all of the evidence that shows the defendants knowingly made false statements about Colson. Consider, example, the following evidence disregarded by the majority: Selleck stated in his affidavit he told Mapel as early as June 1993 there was no basis for bringing crimi-

nal charges against the council members. Mapel then told Hogg his office would take no action. Selleck testified that Hogg and Grohman accused Councilman Miller of illegally receiving a salary from two governmental entities at the same time, without revealing it was Grohman who had suggested that Miller do so. County Investigator Blankenship stated in his affidavit Hogg offered Selleck 1,800 votes from the members of Pearland's First Baptist Church if Selleck ran for District Attorney if Selleck convinced the grand jury to indict Colson, Miller, and Frank. Hogg himself admitted in deposition testimony he prepared recall petitions even though he knew it was improper for him to do so and it was unusual for him to become personally involved in criminal investigations.

### Conclusion

Clearly Colson was defamed. No elected official should have to endure the kinds of attacks to which she was subjected.