*216 Opinión concurrente y disidente emitida por la
Juez Asociada Señora Rodríguez Rodríguez.
Concurro con la Opinión que emite hoy este Tribunal por considerar correcta la determinación con respecto a las controversias sobre la sustitución del juez de primera ins-tancia, la responsabilidad del Ledo. Héctor Santiago Rivera y la conclusión de que en este caso se probó la difa-mación con malicia real de la que fue objeto la demandante por parte de los demandados. No obstante, disiento de la reducción sustancial de la suma de daños concedidos a la fiscal Meléndez y de la eliminación de los honorarios con-cedidos por temeridad bajo el pretexto de que la cuantía otorgada aumentará debido a los intereses postsentencia.
A continuación repasamos el derecho aplicable y los cri-terios que consideramos que deben tomarse en cuenta al analizar una causa de acción por los daños acumulativos de la publicación de una serie de artículos difamatorios y la valorización de estos daños.
I
Los hechos que generaron la controversia ante nosotros están adecuadamente resumidos en la Opinión del Tribunal, por lo que solo resaltaré aquellos detalles que justifi-can que la cuantía de daños no sea disminuida arbitrariamente.
La Leda. Iris Meléndez Vega (fiscal Meléndez) fue desig-nada Directora del Centro Metropolitano de Investigacio-nes y Denuncias (CMID) del Departamento de Justicia el 3 de septiembre de 1990. En el puesto de Secretaria Legal I del Director o Directora del CMID se desempeñaba la de-mandada, Sra. Martha Marrero Rivera. La fiscal Meléndez decidió retener a la señora Marrero como secretaria para no crear ningún tipo de ansiedad entre los empleados por *217 hacer cambios de personal, descartando la idea de reclutar a alguien de confianza para el puesto de secretaria.
Con el pasar del tiempo, según las determinaciones de hechos del Tribunal de Primera Instancia, la relación labo-ral entre la fiscal Meléndez y la señora Marrero comenzó a generar fricciones por varios incidentes de insubordinación protagonizados por la secretaria. En junio de 1991, la se-ñora Marrero fue trasladada, primero destacada en la ofi-cina central del Departamento de Justicia y luego en la Fiscalía de San Juan. Como detalla la Opinión del Tribunal, los motivos del traslado contrastan entre sí: según la fiscal Meléndez, el traslado ocurrió debido a desavenencias en la relación laboral; la señora Marrero afirma que soli-citó el traslado del CMID por ser víctima de hostigamiento sexual por parte de la fiscal.
Luego del traslado, la señora Marrero presentó una que-rella contra la fiscal Meléndez por alegado hostigamiento sexual, que fue desestimada. Al mismo tiempo, la señora Marrero sostuvo una entrevista con el Sr. José A. Purcell (señor Purcell), donde le ofreció su versión de los hechos que presuntamente culminaron en su traslado. A partir de esta entrevista, la señora Marrero, el señor Purcell, El Vo-cero de Puerto Rico, Inc. (El Vocero) y el Ledo. Héctor Santiago Rivera (licenciado Santiago Rivera), llevaron a cabo continuas acciones difamatorias que consistieron en una serie de artículos publicados en el periódico El Vocero du-rante veintitrés meses y cinco cartas dirigidas al Secreta-rio de Justicia, pero divulgadas a la prensa.
Comenzando el 5 de noviembre de 1991, el periódico El Vocero inició una serie de publicaciones relacionadas a la fiscal Meléndez y a la falsa imputación de hostigamiento sexual por su secretaria en el CMID, la señora Marrero. La mayoría de estas publicaciones fueron redactadas por el señor Purcell, empleado de El Vocero, quien entrevistó y fundamentó sus publicaciones en la versión de los hechos de la señora Marrero.
*218 Una vez finaliza el proceso administrativo de la investi-gación sobre la querella presentada por la señora Marrero en el Departamento de Justicia y varios procedimientos judiciales instados por ésta, el 19 de junio de 1992 la fiscal Meléndez presentó la demanda de difamación que hoy re-solvemos contra El Vocero de Puerto Rico Inc., Caribbean International News Corp., Gaspar Roca, José A. Purcell, Martha Marrero de Ramos y la sociedad de gananciales integrada por ésta y su esposo. Poco después, enmendó su demanda para incluir al Ledo. Héctor Santiago Rivera, re-presentante legal de la señora Marrero.
Luego de un lento, dilatado y accidentado proceso ante dos jueces en el Tribunal de Primera Instancia, cuyo deta-lle se encuentra resumido por la Opinión del Tribunal, casi 12 años después de presentada la demanda, el foro de ins-tancia ordenó a todos los codemandados a compensar a la fiscal Meléndez por los daños ocasionados al difundir ale-gaciones falsas de hostigamiento sexual mediando malicia real. Ala vez, estimó los daños en $1,815,000 por angustias mentales y daños a su reputación. Además, impuso $100,000 a la parte demandada en honorarios de abogado por haber litigado con temeridad e intereses legales sobre ambas cuantías al 5%, desde la fecha de la presentación de la demanda hasta que se dictó la Sentencia.
En desacuerdo con el dictamen, los demandados recu-rrieron al Tribunal de Apelaciones. En una Sentencia emi-tida el 28 de febrero de 2007, el foro apelativo intermedio confirmó la Sentencia del Tribunal de Primera Instancia con respecto a la responsabilidad de la señora Marrero y de la prensa,(1) pero revocó en cuanto a la responsabilidad del licenciado Santiago Rivera.
Inconformes, todas las partes, excepto el licenciado Santiago Rivera, recurren ante nosotros.

*219
II

A

Continuamente se ha reconocido que a partir de 1952 “[l]a fuente principal de la protección contra injurias es [...] la Constitución [...]”. Cortés Portalatín v. Hau Colón, 103 DPR 734, 738 (1975). Véanse: Colón, Ramírez v. Televicentro de P.R., 175 DPR 690, 704-705 (2009); Ojeda v. El Vocero de P.R., 137 DPR 315, 327 (1994); Clavell v. El Vocero de P.R., 115 DPR 685, 690 (1984). Esta protección surge de la Carta de Derechos, que reconoce a toda persona la “pro-tección de ley contra ataques abusivos a su honra, a su reputación y a su vida privada o familiar”. Art. II, Sec. 8, Const. PR, LPRA, Tomo 1, ed. 2008, pág. 317.(2) Sin embargo, al existir un interés social y constitucional de prote-ger la libertad de prensa con el fin de “promover la discusión franca y vigorosa de los asuntos públicos”, Torres Silva v. El Mundo, Inc., 106 DPR 415, 420 (1977), la protección del ciudadano contra la publicación difamatoria genera un conflicto entre dos valores fundamentales que requiere de un análisis cauteloso. Giménez Álvarez v. Silén Maldonado, 131 DPR 91 (1992).
En esencia el análisis va a depender de si el deman-dante es un funcionario o una figura pública con un grado de exigencias constitucionales más fuertes, o si el deman-dante es considerado una persona privada, en cuyo caso se aplicaría un criterio más laxo. En Torres Silva v. El Mundo, Inc., supra, incorporamos en nuestro ordena-miento el análisis constitucional establecido por el Tribunal Supremo de Estados Unidos en New York Times Co. v. *220 Sullivan, 376 US 254 (1964), con respecto al funcionario público o figura pública. Véase Colón, Ramírez v. Televicentro de P.R., supra, pág. 706.
En este caso no existe controversia entre las partes en cuanto a clasificar a la fiscal Meléndez como funcionaría pública(3) clasificación que opinamos es correcta. Sin embargo, la Opinión del Tribunal carece de una discusión sobre el concepto de funcionario público, el cual acarrea una menor protección del individuo frente a publicaciones difamatorias a los ciudadanos. Es apropiado discutir en este caso el alcance del término “funcionario público”, cuyos límites se “rige[n] por consideraciones de índole constitucional” y que el “hecho de ser ‘funcionario’ o ‘empleado’ para otros propósitos jurídicos no es pertinente [...]”. Soc. de Gananciales v. López, 116 DPR 112, 114—115 (1985). Por lo tanto, antes de discutir el criterio necesario para reconocer la causa de acción por difamación según New York Times Co. v. Sullivan, es imprescindible establecer los límites de la clasificación de funcionario público.
En Soc. de Gananciales v. López adoptamos la dirección propuesta por el Tribunal Supremo federal en Rosenblatt v. Baer, 383 US 75 (1966). En este caso, luego de reconocer que en New York Times Co. v. Sullivan se había pospuesto esa discusión para otra ocasión,(4) se discutieron los dos principios que motivaron la creación de la clasificación. En primer lugar, se reconoció que existe un profundo [arraigado; fuerte] compromiso nacional con el principio de que los asuntos públicos deben debatirse sin cohibición al-guna, vigoroza y abiertamente (“ ‘a profound national com *221 mitment to the principle that debate on public issues should be uninhibited, robust, and wide-open”) y que, por lo tanto, ese debate podría incluir ataques poco placenteros a funcionarios públicos. Rosenblatt v. Baer, supra, pág. 85. En este sentido, se reconoce que existe tanto un fuerte in-terés en el debate de asuntos públicos como en debatir so-bre aquellas personas que se encuentran en una posición suficientemente importante para influenciar tales asuntos. Id. Por lo tanto, concluye que la clasificación de “funciona-rio público” aplica “at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs”. Id.
Sin embargo esto solo presenta un criterio para la apli-cación de la clasificación como funcionario público. En Rosenblatt se provee un segundo factor que limita el al-cance de la clasificación, descrito de la forma siguiente:
[w]here a position in government has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees [...]. (Énfasis nuestro). Id., pág. 86.
Para estos empleados públicos se exige el cumplimiento de los dos elementos que motivaron New York Times Co. v. Sullivan y, por lo tanto, el estándar para reconocer la causa de acción por difamación requiere malicia real. Este segundo criterio permite hacer un balance adecuado entre la protección a la libertad de prensa y el interés que posee la sociedad en proteger la reputación de un individuo.
Por otro lado, es necesario resaltar, como lo hizo el Tribunal Supremo federal, que el requisito de malicia real no *222 debe aplicar simplemente porque la publicación difamato-ria sobre un empleado de gobierno haya atraído el interés público. Rosemblatt, págs. 86-87 esc. 13. “ ‘La posición del empleado debe ser tal que invite el escrutinio público y la discusión de la persona que la ocupe [...]’ ”. Soc. de Gananciales v. López, supra, pág. 116.
Según el profesor David A. Eider, el análisis establecido en Rosenblatt ha sido “grossly interpreted, flagrantly mi-saplied or blatantly ignored” tanto por las cortes federales como estatales. D.A. Elder, Defamation: A Lawyer’s Guide, Illinois, Ed. Clark, Broadman, Callaghan, 2003, Sec. 5:1, pág. 5-12. A fin de aplicar de forma adecuada este criterio, este caso nos permite delimitar la aplicabilidad del requi-sito de malicia real, al menos respecto a los abogados que laboran para el Estado Libre Asociado de Puerto Rico. Re-salta el profesor Eider que no debe haber duda de que abo-gados tanto del gobierno federal como del estatal que tie-nen poder decisional o de creación de política pública y un control sustancial sobre aspectos importantes del sistema judicial deben ser clasificados como funcionarios públicos. D.A. Elder, Defamation, Public Officialdom and the Rosenblatt v. Baer Criteria—A Proposal for Revivification: Two Decades After New York Times Co. v. Sullivan, 33 Buff. L. Rev. 579, 673 (1984) (“Clearly, federal or state legal counsel with substantial control over important aspects of the judicial system and significant decision-making or policy-making imput [...] are fairly deemed ‘public officials’ ”).
En Puerto Rico esto incluye necesariamente al Secreta-rio de Justicia, al Fiscal General, al Procurador General y a los Fiscales de Distrito. Sin embargo, es necesario anali-zar la Ley Orgánica del Departamento de Justicia para determinar si la fiscal Meléndez, como Directora del CMID, ocupa una posición que “ ‘invite el escrutinio pú-blico y la discusión de la persona que la ocupe [...]’ ”. Soc. de *223 Gananciales v. López, supra, pág. 116. Mientras, cualquier otro abogado que es simplemente compensado con fondos gubernamentales no debe considerarse funcionario público para efectos del requisito de malicia real, a menos que la parte demandada pueda demostrar que "particular functions and responsibilities of such an attorney qualify him as a ‘public official’ through a fact-intensive delineation of his authority”. Elder, Defamation, Public Officialdom and the Rosenblatt v. Baer Criteria—A Proposal for Revivification: Two Decades After New York Times Co. v. Sullivan, supra, pág. 675.
B
En New York Times Co. v. Sullivan, supra, se estableció el análisis aplicable a la causa de acción de libelo. El Tribunal Supremo federal determinó que “la publicación de un informe falso o comentarios injustificados relacionados con la conducta oficial de un funcionario público están in-munes de reclamaciones por libelo y gozan de un privilegio restringido [...]”. Torres Silva v. El Mundo, Inc., supra, pág. 421. Ese privilegio se pierde cuando la información divul-gada es falsa y cuando su publicación se haya hecho con conocimiento de que era falsa o con un grave menosprecio por comprobar su falsedad. íd. Este requisito es el que New York Times Co. v. Sullivan definió como “malicia real”.
Por lo tanto, en casos que impliquen a un funcionario público, los elementos de la causa de acción de difamación consisten en probar, mediante prueba directa o circunstancial, que: (a) la información difamatoria es falsa, (b) que se publicó a sabiendas de que era falsa o con un grave menosprecio por comprobar si era falsa o no, y (c) que se causaron daños reales. Garib Bazain v. Clavell, 135 DPR 475, 482 (1994); Villanueva v. Hernández Class, 128 DPR 618, 642-643 (1991); Torres Silva v. El Mundo, Inc., supra, pág. 427. Además, según lo resuelto en New York Times Co. v. Sulli *224 van y lo adoptado por este Tribunal, es un requisito constitucional la existencia de una identificación específica —Colón, Ramírez v. Televicentro de P.R., supra, pág. 722—, conocido en el derecho norteamericano como el requisito de “of and concerning the plaintiff”. New York Times Co. v. Sullivan, supra, págs. 290-292. Este requisito “consiste en que para que se resuelva a su favor una demanda por difamación, la parte demandante debe probar que las manifestaciones alegadamente libelosas o calumniosas se referían específicamente a su persona”. Colón, Ramírez v. Televicentro de P.R., supra, pág. 720.
Con respecto a la malicia real, ésta requiere de prueba clara, robusta y convincente. Colón, Ramírez v. Televicentro de P.R., supra, pág. 725; Clavell v. El Vocero de P.R., supra, pág. 696; New York Times Co. v. Sullivan, supra, págs. 285-286. Esto quiere decir que “la parte reclamante deb[e] señalar hechos que, de ser creídos, demuestr[en] que la persona demandada abrigaba serias dudas sobre la certeza de la publicación”. Colón, Ramírez v. Televicentro de P.R., supra, pág. 708. No se trata de evaluar si una persona razonablemente prudente hubiera publicado o investigado un poco más antes de publicar la información falsa, sino que “[t]iene que existir ‘prueba suficiente que permita concluir que el demandado abrigaba serias dudas sobre la cer-teza de la información’”. García Cruz v. El Mundo, Inc., 108 DPR 174, 181 (1978).(5) Finalmente, la suficiencia de la prueba presentada para sustentar la malicia real es una *225 cuestión estrictamente de derecho debido al interés protegido por el requisito de malicia real. Colón, Ramírez v. Televicentro de P.R., supra, pág. 725; Harte-Hanks Communications v. Connaughton, 491 US 657, 685 (1989).
C
En el caso ante nosotros ya habíamos reconocido que la demandante había decidido “demandar por una única causa de acción, al pedir indemnización, no por los daños de cada publicación aisladamente, sino por los efectos acumulativos de todas las publicaciones tomadas en conjunto”. (Enfasis nuestro). Meléndez v. El Vocero de Puerto Rico, 144 DPR 389, 397 (1997) Esta causa de acción —concluimos en aquella ocasión— “es evidentemente diferente a la de reclamar daños por cada artículo publicado, en cuyo caso cada uno de ellos constituiría una causa de acción separada”. íd. Por ende, esta causa de acción requiere de un análisis distinto a la causa de acción por cada publicación, pero deberá conte-ner criterios similares para que se garantice un adecuado balance entre el derecho a la intimidad de la demandante y el derecho a la libertad de expresión del demandado. No podemos atender la controversia ante nuestra consideración mediante un análisis individual de cada artículo, ya que “[l]a acción ante nos es por los daños causados por el efecto acumulativo de la serie de artículos”. (Enfasis nuestro y en el original). íd., pág. 398. Ésta requiere de un análisis global de la serie de artículos publicados junto a un análisis según los criterios de una publicación difamatoria.
En nuestro dictamen anterior no discutimos si esta causa de acción requería un análisis distinto a aquellas en las que se reclama por cada publicación como causas de acción independientes, pues este asunto no estuvo ante nuestra consideración. Lo cierto es que no nos hemos ex-presado sobre cómo se debe probar esta causa de acción. *226 Debido a la clara diferencia entre reclamar por los daños de una publicación y reclamar por el efecto acumulativo de una serie de artículos, ciertamente el análisis no puede ser el mismo. Pasemos entonces a considerar cuáles deben ser estos requisitos.
Para definir lo que constituye una serie de artículos —y determinar si constituyen una publicación difamatoria— debemos comenzar con lo obvio: qué significa “una serie”. La Real Academia Española define el vocablo serie como un “[c]onjunto de cosas que se suceden unas a otras y que están relacionadas entre sí”. Real Academia Española, Dic-cionario de la lengua española, 22da ed., Madrid, Ed. Es-pasa Calpe, 2001, T. II, pág. 2053. Por lo tanto, una serie de artículos consiste de un conjunto de publicaciones suce-sivas relacionadas con el mismo tema. En el caso de que se alegue que los artículos son difamatorios, la serie debe re-ferirse a la misma persona. En este sentido, para efectos de la causa de acción por difamación, definiremos “serie de artículos difamatorios” como un conjunto de publicaciones que consiste de tres o más artículos(6) publicados en fechas distintas, relacionadas al mismo tema y persona, dentro de un periodo de tiempo determinado que refleje un patrón o consistencia y que publican en conjunto una información falsa, hacen una referencia específica a la parte deman-dante, son publicados con malicia real y generan daños.
Ahora bien, esto no quiere decir que cada uno de los artículos tiene que ser difamatorio por sí solo. Por ser la causa de acción dirigida al efecto acumulativo de todos los artículos en conjunto, al evaluar la prueba presentada se debe considerar el efecto que tiene la insistente publicación de información falsa, con grave menosprecio de si es falsa o no. En este sentido, es irrelevante determinar el número de artículos difamatorios, si en efecto todos los artículos *227 publicados vinculan a la demandante continuamente con aquellos artículos que, analizados de forma independiente, son difamatorios. Al ser una causa de acción distinta, los tribunales están obligados a evaluar todos los requisitos antes mencionados, pero tomando la serie como un conjunto. De lo contrario, no existiría diferencia alguna entre presentar una reclamación por cada uno de los artículos y presentar la causa de acción reconocida por este Tribunal en eta-pas anteriores de este caso. Véase Meléndez v. El Vocero de Puerto Rico, supra.(7) Evidentemente, reclamar los daños por los efectos acumulativos de una serie de artículos es distinto a reclamar por los daños generados por cada uno de ellos. Íd., pág. 397.
Es necesario aclarar que el efecto de este análisis pro-puesto no sanciona las expresiones protegidas por nuestra Constitución o la de Estados Unidos, ya que, probada la malicia real de las publicaciones, el derecho a la libertad expresión no permite la continuidad de la publicación de información falsa. Aquellos artículos que contengan expresiones protegidas no se tomarán en cuenta para el efecto acumulativo, a menos que contengan una referencia específica de continuidad en cuanto a los artículos difamatorios. De esta forma se salvaguarda el derecho a la libertad de expresión y se limita cualquier efecto de autocensura. Colón, Ramírez v. Televicentro de P.R., supra, pág. 703; Pérez v. El Vocero de P.R., 149 DPR 427 (1999). Por lo tanto, el análisis del efecto acumulativo de una serie de artículos es sui generis y consiste en evaluar la serie de artículos publicados en fechas distintas, que se refieren a un mismo tema y una misma persona, junto con los requi- *228 sitos jurisprudenciales de una publicación difamatoria, ex-cluyendo solo los artículos que contengan expresiones pro-tegidas sin la intención de proveer continuidad a anterio-res publicaciones difamatorias.
III
A
Apliquemos el marco jurídico expuesto a la controversia ante nosotros. Del expediente del caso surge que por vein-titrés meses El Vocero publicó, de manera consistente y habitual, cuarenta y tres artículos cuyo tema constante fue la fiscal Meléndez y las falsas imputaciones de hostiga-miento sexual por parte de la señora Marrero. Según se definió anteriormente, nos encontramos ante una serie de artículos difamatorios.
La fiscal Meléndez trabajó como abogada en el Departa-mento de Justicia desde que fue admitida a la profesión. Su primer nombramiento como Fiscal Auxiliar ocurrió en 1979, y ascendió por los distintos niveles jerárquicos del ministerio público hasta recibir en 1991 la designación de Fiscal Especial General.(8) Este es el nombramiento que debemos analizar para determinar si es acertado o no de-nominar a la fiscal Meléndez como funcionaría pública y aplicar los requisitos de New York Times Co. v. Sullivan.
La Ley Orgánica del Departamento de Justicia, Ley Núm. 205 de 9 de agosto de 2004, 3 LPRA secs. 291-295u (Ley Núm. 205), establece las funciones y los deberes del Secretario de Justicia, de los otros funcionarios y empleados del Departamento, y provee, además, la organización interna necesaria para que el Secretario pueda cumplir con sus funciones constitucionales indispensables. Asimismo, la Ley Núm. 205 crea los cargos particulares de Fiscal Ge *229 neral de Puerto Rico y Procurador General, con sus respec-tivos deberes y funciones. 3 LPRA secs. 293v y 294k. Final-mente, establece las distintas categorías de fiscales y pro-curadores que componen la mayoría de los empleados del Departamento. Estos últimos, según la Ley Núm. 205, estaban subeategorizados en: Fiscales Especiales Generales, Fiscales de Distrito, Fiscales Auxiliares III, Fiscales Auxiliares II, Fiscales Auxiliares I, Procuradores de Asuntos de Familia y Procuradores de Asuntos de Menores.(9) Todas estas posiciones requieren el nombramiento por el Gober-nador o la Gobernadora de Puerto Rico con el consejo y consentimiento del Senado. 3 LPRA sec. 294q. Cierta-mente, todos deben ser abogados admitidos a la profesión por el Tribunal Supremo de Puerto Rico y gozar de “buena reputación moral, intelectual y profesional [...]”. 3 LPRA sec. 294s. Sin embargo, existe una diferencia en cuanto a los años de experiencia profesional requerida para sus nombramientos.
En el caso de los Fiscales Especiales Generales, Fiscales de Distrito y Fiscales Auxiliares III, se requería por lo me-nos seis años de experiencia profesional. Los Fiscales Auxi-liares III, Procuradores de Asuntos de Menores y Procura-dores de Asuntos de Familia requerían cuatro años de experiencia profesional, y los Fiscales Auxiliares I solo re-querían de un año de experiencia.(10) Esta diferencia se sustenta esencialmente en las funciones y los deberes par-ticulares reconocidos a los Fiscales Especiales Generales y a los Fiscales de Distrito.
*230 Según la Ley Núm. 205, los Fiscales Especiales Genera-les tenían,
[A]demás de los deberes, poderes, obligaciones y autoridad que la ley confiere a los Fiscales de Distrito [...], los siguientes [deberes y funciones]:
(a) Supervisar y dirigir las divisiones y unidades especiali-zadas en el área criminal o en cualquier área del Departa-mento que el Secretario determine.
(b) Investigar los asuntos penales, civiles y administrativos que el Secretario o el Fiscal General le encomiende y represen-tar a estos funcionarios ante las agencias gubernamentales en la vista de cualquier causa.
(c) Actuar como representante del Pueblo de Puerto Rico, en cualquier caso penal o civil en el Tribunal de Primera Instancia. 3 LPRA sec. 294z.(11)
Como puede apreciarse, al redactar la Ley Núm. 205 el legislador diferenció marcadamente los requisitos, los de-beres y las funciones del Secretario o de la Secretaria de Justicia, el Procurador o la Procuradora General, el o la Fiscal General, los o las Fiscales de Distrito, y los o las Fiscales Especiales Generales y los demás fiscales.(12) En particular, se le encomendó a los Fiscales Especiales Gene-rales “supervisar y dirigir” divisiones y unidades especiali-zadas del Departamento de Justicia. Evidentemente, estos deberes adicionales al cargo de Fiscal Especial General motivan el “ ‘escrutinio público y la discusión de la persona *231 que [ocupe la posición]’ Soc. de Gananciales v. López, supra, pág. 116. Por lo tanto, la clasificación de funcionario público, en el caso del Departamento de Justicia, incluye a los funcionarios siguientes: Secretario o Secretaria de Jus-ticia, Procurador o Procuradora General, Fiscal General, Fiscales de Distrito y Fiscales Especiales Generales. En el caso ante nosotros, al momento de los hechos la fiscal Me-léndez poseía un nombramiento de Fiscal Especial General, encargada de dirigir el CMID Consecuentemente, ha de ser clasificada como funcionaria pública con una protección limitada frente a publicaciones difamatorias.(13)
B
Determinada su clasificación como funcionaria pública, procede analizar si la información difamatoria es falsa, si se publicó con malicia real y si le causó daños reales a la demandante.
En este aspecto concurro con el análisis de la Opinión del Tribunal. Del examen independiente del expediente en el caso ante nosotros surge la falsedad de la información publicada y se evidencia clara y convincentemente la exis-tencia de malicia real por parte de la señora Marrero y de El Vocero. No es necesario repetir la prueba testimonial y la serie de contradicciones que llevaron al Tribunal de Pri-mera Instancia a determinar que “la señora Marrero tenía ‘un plan concertado de hacer todo lo posible por mancillar y desacreditar la reputación de la [fiiscal Meléndez’ [...]”. Opinión del Tribunal, pág. 178. Esta determinación fue confirmada por el Tribunal de Apelaciones, que resaltó que la señora Marrero “publicó sus imputaciones de hostiga- *232 miento sexual a sabiendas de que eran falsas”. íd., pág. 179. De la misma manera, concurro con la exposición y determinación de la Opinión del Tribunal con respecto a las publicaciones de la prensa. El expediente de este caso muestra que “había indicaciones suficientes para dudar de la veracidad de [la] informante principal” de la prensa. Id., pág. 192. Además, como se resalta la Opinión del Tribunal:
[E]n el caso de autos ni siquiera se le dio una oportunidad a la licenciada Meléndez de ofrecer su versión de los hechos a la prensa. Esto tiende a indicar que no solo hubo una falta de investigación adecuada, sino que la prensa quería evitar ente-rarse de información que la pondría en una posición comprometedora. Id., pág. 195.
Cabe resaltar que la fiscal Meléndez probó la existencia de malicia real por parte de la prensa, “no solo en cuanto al primer artículo, sino a través del tiempo que se prolongó la serie aquí reclamada”. (Enfasis nuestro). Id.
C
Con respecto al requisito constitucional de referencia es-pecífica, un análisis integral de los cuarenta y tres artículos publicados por El Vocero nos lleva a concluir que la serie de artículos publicados se refieren constantemente a la demandante. El elemento constante de la serie de artículos publicados es la controversia generada alrededor de unas imputaciones falsas de hostigamiento sexual. En vista de que la causa de acción presentada por la fiscal Meléndez está dirigida a los daños generados por el efecto acumula-tivo de la serie de artículos, el requisito de referencia espe-cífica debe satisfacerse con los artículos analizados en conjunto.
Evaluados los artículos contenidos en el expediente en-contramos que en todos y cada uno de los artículos que com-ponen la serie de publicaciones del periódico El Vocero se *233 hace referencia específica al nombre de la fiscal Meléndez.(14) Por otro lado, una mayoría de las publicacio-nes contiene como parte de su titular, y resaltadas en letras engrandecidas, las palabras “acoso sexual”, “hostigamiento” o “caso hostigamiento”, aun cuando su contenido se refería a aspectos procesales de la investigación o a procedimientos judiciales. La única intención que se puede inferir del uso continuo de estas palabras en los artículos que hacen refe-rencia a la fiscal Meléndez era mantener vivo el vínculo en-tre ésta y las falsas acusaciones de hostigamiento. Final-mente, en el periodo de veintitrés meses en que se publicó la serie de artículos, El Vocero incluyó la fotografía de la fiscal Meléndez en ocho ocasiones, con la clara intención de man-tener relacionada a la demandante con los hechos y las im-putaciones de hostigamiento publicados en la serie de artículos.
Por lo tanto, existe una clara referencia específica a la demandante durante todo el periodo de publicación de la serie de artículos en controversia.
IV
A
Nos resta analizar los daños concedidos a la fiscal Me-léndez, reducidos por la Opinión del Tribunal. Reiterada-mente hemos expresado que “los foros apelativos no debe[mos] intervenir con la apreciación de la prueba y la determinación de daños que realice un tribunal de instan- *234 cia, salvo que ésta sea exageradamente alta o ridiculamente baja”. Rodríguez et al. v. Hospital et al., 186 DPR 889, 929 (2012) (Rodríguez Rodríguez, J., Op. concurrente y disidente). Sin embargo, hoy una mayoría de este Tribunal ignora las determinaciones del tribunal de instancia y, sin ofrecer mayor explicación en cuanto a su metodología, reduce sustancialmente los daños concedidos.
El juez de instancia fundamentó su determinación de los daños otorgados basándose en la práctica doctrinal de “utilizar como guía o punto de partida las sumas concedidas [...] en casos similares”. Sentencia del Tribunal de Primera Instancia, pág. 95, Caso Núm. AC-2007-66, Apéndice de la Apelación civil, pág. 000631 (citando a Vázquez v. Woolworth & Co., 143 DPR 76 (1997)). Esta práctica ha sido reiterada en innumerables ocasiones, incluso tan reciente como el pasado mes de octubre en Rodríguez et al. v. Hospital et al., supra, pág. 899 (Opinión del Tribunal). Sin embargo, para una mayoría de este Tribunal hoy esta práctica parece insuficiente.
El juez sentenciador utilizó como guía tres casos simila-res para comenzar su análisis y valorizar los daños ocasio-nados a la fiscal Meléndez. La similitud de los casos pre-sentados con el caso ante nosotros consiste en que éstos fueron procedimientos en los que se les concedió una in-demnización a los miembros de la profesión legal una vez probada la causa de acción por libelo. Ciertamente, este Tribunal nunca había resuelto una controversia donde se satisficieran todos los requisitos de una causa de acción de libelo según los criterios de New York Times Co. v. Sullivan, por lo tanto, no existe un precedente puntual con res-pecto a la valorización de daños. Sin embargo, esto no quiere decir que debemos ignorar las indemnizaciones ava-ladas por este Tribunal en controversias que tengan carac-terísticas similares. El examinar cuantías concedidas en casos anteriores, “[a]demás de constituir un punto de par- *235 tida [...] reduce el margen de arbitrariedad implícito en la valorización de un daño no pecuniario”. Rodríguez et al. v. Hospital et al., supra, pág. 930 (Rodríguez Rodríguez, J., Op. concurrente y disidente).
Según resolvimos en. Herrera, Rivera v. S.L.G. Ramírez-Vicéns, 179 DPR 774 (2009), una vez se identifican casos anteriores similares y las cuantías que se concedieron, lo que procede es ajustarlas a su valor presente. Rodríguez et al. v. Hospital et al., supra, pág. 930, (Rodríguez Rodríguez, J., Op. concurrente y disidente). En Rodríguez et al. v. Hospital et al. una mayoría de este Tribunal decidió alterar el análisis originalmente adoptado por esta Curia en Herrera, Rivera y formular uno distinto. A pesar de disentir por el cambio de metodología adoptado,(15) procede que analicemos los hechos en este caso conforme a lo que la mayoría dictaminó en Rodríguez et al. v. Hospital et al. Así, una vez se realizan los “cálculos, la cuantía resultante debe ser analizada a la luz de las circunstancias particula-res del caso considerado ante el Tribunal”. Herrera, Rivera v. S.L.G. Ramírez-Vicéns, supra, pág. 786. Solo se debe in-tervenir “con la indemnización concedida [...] cuando, to-mando en cuenta las concesiones por daños en casos simi-lares anteriores actualizadas al momento de la sentencia, y a la luz de las circunstancias particulares del caso ante la consideración del Tribunal, la cuantía concedida se desvía manifiestamente de lo que sería una indemnización razonable por ser ‘ridiculamente baja o exageradamente alta’ ”. Herrera, Rivera v. S.L.G. Ramírez-Vicéns, supra, págs. 786-787.
Veamos el análisis del tribunal primario. El juez de ins-tancia identificó tres casos donde se concedía cierta indem-nización en casos de libelo a miembros de la profesión legal. Los casos son: Franco v. Martínez, 29 DPR 237 *236 (1921), Rivera v. Martínez, 26 DPR 760 (1918), y Benet v. Hernández, 22 DPR 494 (1915); Franco v. Martínez, 29 DPR 237 (1921). En promedio, la compensación otorgada en los casos fue de $3,333. Utilizando la fórmula propuesta por el tratadista Amadeo Murga en su obra El valor de los daños en la responsabilidad civil, esta compensación ten-dría un valor, a diciembre de 2003, de $172,075.(16)
Una vez actualizada la compensación de casos simila-res, el juez de instancia resaltó las características del caso ante su consideración, según la evidencia presentada, que justifican aumentar considerablemente la compensación. Expuso el juez que “[e]n el caso de autos debemos conside-rar las circunstancias particulares tales como, el número de publicaciones realizadas por el periódico (43), el efecto cumulativo que éstas tuvieron en la mente y la conciencia de la víctima (efecto sicológico), la duración o tiempo de las publicaciones”, entre otros factores. (Énfasis nuestro). Sen-tencia del Tribunal de Primera Instancia, págs. 98-99, Caso Núm. AC-2007-66, Apéndice de la Apelación civil, págs. 000634-000635 Además, reconoció que se tienen que “valorar separadamente los daños a la reputación del daño por angustias mentales lo que implica una mayor compen-sación de daños en general”. Íd., pág. 000635.(17)
*237 Con esto en mente, el juez valoró los daños causados por la primera publicación en $515,000. Con respecto al efecto acumulativo de las otras cuarenta y dos publicaciones, con-cedió $1,050,000 y, finalmente, valoró los daños causados a la reputación de la fiscal Meléndez en $250,000, para un total de $1,815,000 en daños. íd.
Esta valorización de los daños fue confirmada por el Tribunal de Apelaciones luego de estudiar la evidencia pre-sentada por la fiscal Meléndez durante el juicio. Luego de destacar ciertas partes del testimonio, el tribunal concluyó que “los apelantes no han traído a la atención de este Tribunal circunstancia alguna que evidencie que el foro ape-lado fue arbitrario y trasgredió los límites de su función de estimar el valor de la compensación a la que vienen obligados los apelantes”. (Enfasis nuestro). Sentencia del Tribunal de Apelaciones, pág. 59, Caso Núm. AC-2007-66, Apéndice de la Apelación civil, pág. 1661.(18)
Tomando en consideración que la demandante en este caso presentó su causa de acción dirigida a pedir una in-demnización por los efectos acumulativos de todas las pu-blicaciones en conjunto, no se debe otorgar la partida de daños concedida por la primera publicación. Por otro lado, considerando que el juez de instancia siguió la práctica doctrinaria para valorar los daños ocasionados a la fiscal Meléndez, ciertamente una tarea “ ‘difícil y angustiosa, debido a que no existe un sistema de computación que per-mita llegar a un resultado exacto’ ”, Rodríguez et al. v. Hospital et al., supra, pág. 929 (Rodríguez Rodríguez, J., Op. concurrente y disidente), no debemos intervenir con la dis-creción, razonabilidad y apreciación de la prueba de quien *238 tiene “un vínculo más cercano con la prueba testifical del caso y todos los componentes que lo rodean”. Id. Por lo tanto, eliminaría la compensación concedida por los daños de la primera publicación y solo ajustaría la compensación por el efecto acumulativo de la serie de publicaciones para que considere la primera publicación dentro de esta compensación.
Ahora bien, han transcurrido nueve años desde que el Tribunal de Primera Instancia emitió la sentencia en la que declaró “con lugar” la causa de acción de la demandante. Ante la arbitraria reducción de la valorización de los daños por parte de una mayoría de este Tribunal, es necesario ha-cer un análisis de actualización en la valorización de los daños al año corriente para mostrar la categórica subvalo-ración de los daños que sufrió la funcionaría pública.
Utilizando los tres casos similares señalados por el Tribunal de Primera Instancia, los valores actualizados(19) de cada uno, según la fórmula establecida por una mayoría de este Tribunal en Rodríguez et al. v. Hospital et al., son: $22,758.62,(20) $22,862.06(21) y $32,592.72(22), respectivamente. En promedio, se otorgaron $26,071.33 en daños por un solo acto de difamación, y en sólo uno de *239 los casos por una publicación en un periódico. Por lo tanto, el efecto negativo en la conciencia de la víctima y su reputación ciertamente eran menores a los acaecidos en el caso ante nosotros.
Vista la marcada diferencia con respecto al número de publicaciones, el tiempo de duración de la actuación difa-matoria y el hecho de que en este caso hubo más de una actuación difamatoria, la cantidad anterior debe ser au-mentada considerablemente. La prueba presentada y creída tanto por el Tribunal de Primera Instancia como por el Tribunal de Apelaciones demuestra los daños que le cau-saron las publicaciones a la fiscal Meléndez, tanto en su vida personal y familiar, como en la profesional. Según concluye el Tribunal de Apelaciones, “el foro sentenciador tuvo ante sí la prueba testimonial necesaria sobre el efecto traumático que causó en la Leda. Meléndez toda esa experiencia”. Sentencia del Tribunal de Apelaciones, pág. 57, Caso Núm. AC-2007-66, Apéndice de la Apelación civil, pág. 1659.
Tomando en cuenta las indemnizaciones actualizadas en casos similares y la causa de acción presentada por la fiscal Meléndez, procede otorgar una cantidad que refleje el valor de los daños por el efecto acumulativo de la publi-cación de cuarenta y tres artículos de periódico, algunos con retrato de la demandante, otros en portada y todos con referencia constante a las falsas acusaciones por hostiga-miento sexual. Vista la cantidad otorgada por el Tribunal de Primera Instancia y reconociendo que tal foro se en-cuentra en una mejor posición para aquilatar el testimonio presentado, considero que al eliminar la cantidad otorgada solo por el primer artículo difamatorio e integrarlo al aná-lisis del efecto acumulativo de la serie, se deben valorizar los daños en no menos de $1,100,000.
Hemos visto que se ha otorgado en promedio $26,071.33 por un acto difamatorio probado ante un Tribunal. En este caso hubo constantes actuaciones difamatorias, incluyendo *240 cuarenta y tres publicaciones en un periodo de veintitrés meses en un periódico de circulación general en Puerto Rico. Sin llevar a cabo un análisis individual de cada una de las publicaciones, podríamos equiparar cada publicación a una actuación difamatoria por mantener la continuidad de la publicación de información falsa. Si dividimos la can-tidad de $1,100,000 entre esas cuarenta y tres publicacio-nes, cada publicación, en promedio, generó un daño de $25,581.40. Por lo tanto, en comparación con la valoriza-ción de los daños otorgados en el pasado por este Tribunal una vez probada una actuación difamatoria, vemos que el valor del daño por efecto acumulativo que proponemos otorgar es jurídica y metodológicamente razonable. Apli-cando este análisis, reducimos los márgenes de arbitrarie-dad que genera la reducción sin discusión de la Opinión del Tribunal.
B
Por otro lado, una mayoría del Tribunal decide dejar sin efecto la decisión del Tribunal de Primera Instancia de con-ceder honorarios de abogados luego de determinar que la parte demandada actuó con temeridad en la litigación del caso. Como resalta la Opinión del Tribunal, la Regla 44.1(d) de Procedimiento Civil, 32 LPRA Ap. III (ed. 2001), dispone para la otorgación de estos honorarios en aquel procedimiento donde “una parte haya procedido con teme-ridad o frivolidad durante el trámite judicial [...]”. Opinión del Tribunal, pág. 211. Por otro lado, “hemos indicado que un litigante actúa con temeridad cuando con Terquedad, obstinación, contumacia e insistencia en una actitud des-provista de fundamentos, obliga a la otra parte, innecesa-riamente, a asumir las molestias, gastos, trabajo e inconvenientes de un pleito’ ”. S.L.G. Flores-Jiménez v. Colberg, 173 DPR 843, 866 (2008). Igualmente, “la determinación de temeridad es de índole discrecional, por lo que sólo de- *241 bemos intervenir con ella cuando nos enfrentemos a un caso de abuso de discreción”. (Énfasis nuestro). Íd. Véanse: Colón Santos v. Coop. Seg. Mult. P.R., 173 DPR 170 (2008); P.R. Oil v. Dayco, 164 DPR 486 (2005).
Incluso, este Tribunal ha reconocido varias de las situa-ciones en las que existe temeridad, a saber:
(1) contestar una demanda y negar responsabilidad total, aunque se acepte posteriormente; (2) defenderse injustificadamente de la acción; (3) creer que la cantidad reclamada es exagerada y que sea esa la única razón que se tiene para oponerse a las peticiones del demandante sin admitir francamente su responsabilidad, pudiendo limitar la controversia a la fijación de la cuantía a ser concedida; (4) arriesgarse a litigar un caso del que se desprendía prima facie su responsabilidad, y (5) negar un hecho que le conste es cierto a quien hace la alegación. Blás v. Hospital Guadalupe, 146 DPR 267, 335-336 (1998).
Discutido el derecho, considero inapropiada la intervención de este Tribunal con la discreción del foro de instancia. El Tribunal de Primera Instancia, al determinar que hubo actuación temeraria por la parte demandante, justificó su conclusión en que “los demandados incurrieron en conducta o actuación obstinada, contumaz, temeraria o frívola al radicar una serie de mociones y recursos cuya improcedencia era clara, [y] cuyo propósito fue dilatar los procedimientos”. (Énfasis nuestro). Sentencia del Tribunal de Primera Instancia, pág. 102, Caso Núm. AC-2007-66, Apéndice de la Apelación civil, pág. 000638. Ciertamente este Tribunal ha reconocido que no procede la determinación de temeridad “cuando lo que se plantea ante el tribunal de instancia son planteamientos complejos y novedosos que no han sido resueltos en nuestra jurisdicción”. (Énfasis suprimido). Santiago v. Sup. Grande, 166 DPR 796, 821 (2006). Pero esa no es la situación en este caso. Este Tribunal adoptó la doctrina y el requisito de malicia real es-tablecida en New York Times Co. v. Sullivan desde Torres *242 Silva v. El Mundo, Inc., supra, por lo que no nos encontramos ante una controversia novedosa no resuelta.
Reconociendo la discreción del Tribunal de Primera Ins-tancia y ante falta de prueba sobre abuso de discreción por ese foro, no procede la eliminación de honorarios de abo-gado impuestos por temeridad.
C
Finalmente, el procedimiento legal que genera la Opi-nión que hoy emite este Tribunal comenzó hace más de veinte años. A todas luces, refleja una contravención al principio inmerso en nuestras Reglas de Procedimiento Civil de garantizar “una solución justa, rápida y económica de todo procedimiento”. (Énfasis nuestro). Regla 1 de Pro-cedimiento Civil, 32 LPRA Ap. V. Como si la ardua, extensa y tortuosa litigación junto a los años de espera por un re-sultado favorable fuera poco, hoy una mayoría de este Tribunal, aunque resuelve que tanto la señora Martha Ma-rrero de Ramos como la prensa difamaron la buena reputación de la fiscal Iris Meléndez Vega con imputacio-nes falsas de alegados hechos de hostigamiento sexual, reduce los daños concedidos sin mucha explicación y descartando el análisis del Tribunal de Primera Instancia. Anticipando el cuestionamiento de la reducción, nos alerta que no debemos preocuparnos, ya que “el monto que debe satisfacerse de la Sentencia aumentará aún más”(23) por los intereses post sentencia. Regla 44.3(a) de Procedimiento Civil, 32 LPRA Ap. III (ed. 2001). Esto, sin embargo, no justifica la reducción de los daños sufridos en este caso.
La imposición de intereses a partir del dictamen de una sentencia que ordene el pago de dinero es parte de la polí-tica pública establecida por nuestro ordenamiento jurídico desde principios de siglo. Más aún, este Tribunal constan- *243 temente ha dicho “que estos intereses forman parte inte-grante de la sentencia dictada y que pueden ser recobrados aun cuando no se mencionen en la misma”. Municipio de Mayagüez v. Rivera, 113 DPR 467, 469 (1982). Aún más recientemente, interpretando la Regla 44.3, expresamos que es “mandatorio que un tribunal, al dictar sentencia en la que ordena la entrega de dinero, imponga el pago de interés al tipo legal sobre la cuantía de la sentencia, sin excepción de clase alguna”. Vélez Cortés v. Baxter, 179 DPR 455, 480 (2010) (Rodríguez Rodríguez, J., Op. conformidad). Por lo tanto, es irrelevante para la valorización de los daños ocasionados a la demandante si la cuantía que en su día pueda recobrar aumenta o no por los intereses post sentencia.
V
En fin, concurro con la determinación de la Opinión del Tribunal con respecto a las controversias sobre la sustitu-ción del juez de primera instancia, la responsabilidad del licenciado Héctor Santiago Rivera y la conclusión de que en este caso se probó la difamación con malicia real por parte de los demandados hacia la fiscal Meléndez. Además, concurro con la determinación de que el análisis que se tiene que llevar a cabo cuando se presente una causa de acción por el efecto acumulativo de una serie de publicacio-nes difamatorias, las publicaciones tienen que estudiarse en conjunto y no de manera individualizada.
Ahora bien, disiento de la disminución arbitraria en más de cinco veces la cuantía otorgada por el Tribunal de Primera Instancia sin una discusión mayor y la elimina-ción de los honorarios de abogado por temeridad. Como se puede apreciar de los cómputos presentados anterior-mente, al actualizar las indemnizaciones otorgadas en los casos similares resaltados al valor del dólar para el año 2012, la cantidad a otorgarse aún sería inferior a la otor- *244 gada por el Tribunal de Primera Instancia en el 2004. La reducción de los daños a $350,000(24) que confiere una ma-yoría de este Tribunal no es más que un vilipendio a los daños que sufrió la demandante por las actuaciones mal intencionadas, poco profesionales e insolentes de los de-mandados en este caso. Por lo tanto, lo que procede es to-mar en consideración los precedentes de indemnizaciones por difamación a miembros de la profesión legal, atempe-rarlos por inflación y evaluar el efecto acumulativo del daño generado a la demandante. Por consiguiente, elimi-naría los daños otorgados por el foro de instancia por la primera publicación, los integraría al análisis del efecto de la serie y otorgaría $1,100,000 con respecto al efecto acu-mulativo de las publicaciones. Igualmente, confirmaría la cuantía de $250,000 otorgada por los daños causados a la reputación de la demandante. Finalmente, procede confir-mar al Tribunal de Apelaciones en su determinación de que no se probó que el foro primario abusara de su discreción al conceder los honorarios por temeridad y conceder los inte-reses post sentencia desde la presentación de la demanda.

 Al igual que la Opinión del Tribunal, nos referimos al señor Purcell, Caribbean International News Corp., El Vocero de Puerto Rico, Inc. y el señor Roca conjuntamente como “la prensa”.

 Por otro lado, también se ha reconocido que la acción por difamación o libelo en nuestra jurisdicción tiene tres fuentes: la propia See. 8 del Art. II, Const. PR, LPRA, Tomo 1; la Ley de Libelo y Calumnia, Ley de 19 de febrero de 1902, 32 LPRA see. 3Í41 et seq., y el Art. 1802 de nuestro Código Civil, 31 LPRA see. 5141. Sin embargo, la Ley de Libelo y Calumnia solo aplica “en cuanto es compatible con la Constitución”. Cortés Portalatín v. Hau Colón, 103 DPR 734, 738 (1975).

 En el Informe de Conferencia con Antelación al Juicio, la fiscal Meléndez expone como parte de su teoría del caso que:
“Por ser funcionaría pública, para prevalecer en este caso la aquí demandante tiene que probar, con prueba clara y convincente, que las publicaciones se hicieron con ‘malicia real’, esto es, con conocimiento de su falsedad, o con grave menosprecio respecto a si eran falsas o no”. Caso Núm. CC-2007-827, Apéndice, pág. 843.

 Véanse: Rosenblatt v. Baer, 383 US 75, 85 (1966); New York Times Co. v. Sullivan, 376 US 254, 283 esc. 23 (1964).

 Es importante resaltar que el concepto malicia real no tiene que ver con la intención del demandado en publicar información difamatoria, sino con el conoci-miento que tuvo en el momento de la publicación. Según hemos expresado antes: “Quien se expresa con malicia real lo hace a sabiendas de que los hechos imputados son falsos o con grave menosprecio a la verdad, incurriendo en el susodicho menosprecio quien se expresa albergando serias dudas con respecto a la veracidad de los hechos imputados”. Cabrero v. Zayas, 167 DPR 766, 779 (2006) (Sentencia) (Rodríguez Rodrí-guez, J., Op. conformidad). El concepto malicia real “es una figura subjetiva”, donde se debe probar, no que el demandado debió actuar como hubiera actuado una persona normal, sino que actuó con conocimiento de la ausencia de la verdad en su publicación. íd.

 Nos parece razonable definir serie como tres artículos o más, ya que la pu-blicación de una cantidad menor de artículos no presenta un interés de continuidad sobre el tema o la persona sobre quien se publica la información. En estos casos solo estaría disponible una causa de acción por cada publicación difamatoria.

 En aquella ocasión claramente distinguimos la causa de acción separada por cada artículo publicado de la causa de acción por el efecto acumulativo de una serie de artículos. Con respecto a la figura de prescripción, expresamos: “No puede haber, pues ‘prescripción’ de alguno de esos artículos porque lo que puede prescribir es la causa de acción, no un elemento de ésta”. (Enfasis nuestro). Meléndez v. El Vocero de Puerto Rico, 144 DPR 389, 398 (1997). No podemos evaluar de manera independiente los artículos, cuando anteriormente reconocimos que solo constituyen un elemento de la causa de acción por el efecto acumulativo de una serie.

 La fiscal Meléndez fue designada por el entonces gobernador Rafael Hernán-dez Colón.

 El Plan de Reorganización Núm. 5 de 2011 sustituyó “Fiscales Especiales Generales” con “Fiscales Auxiliares IV”, “Fiscales de Distrito” con “Fiscales Auxiliares” y “Fiscal General” con “Jefe de Fiscales”.

 Con las enmiendas del Plan de Reorganización Núm. 5 de 2011, los años de experiencia profesional requeridos son los siguientes: Fiscal de Distrito: Diez años de experiencia profesional; Fiscal Auxiliar IV: Ocho años de experiencia profesional; Fiscal Auxiliar III: Seis años de experiencia profesional; Fiscal Auxiliar II: cuatro años de experiencia profesional; Fiscal Auxiliar I: Dos años de experiencia profesional; Procuradores de Asuntos de Menores y Procuradores de Asuntos de Familia: Cuatro años de experiencia profesional. 3 LPRA sec. 294s.

 El Artículo 75 de la Ley Núm. 205 establece que las funciones y los deberes de Fiscal de Distrito son los siguientes:
“(a) Supervisar el personal adscrito a la fiscalía.
(b) Asignar los casos e investigaciones correspondientes entre los fiscales bajo su supervisión.
(c) Velar por que los asuntos propios de la fiscalía se conduzcan de manera eficiente y expedita.
(d) Recomendar al Fiscal General y al Secretario cualquier movimiento del personal adscrito que se estime propio hacer, así como solicitar recursos adicionales que se entiendan necesarios para el mejor funcionamiento de la fiscalía.
(e) Realizar las funciones y deberes ordinarios de fiscal y cualquier otra tarea o encomienda que tenga a bien asignarle el Fiscal General o el Secretario”. 3 LPRA see. 295.

 Fiscales Auxiliares III, II y I; Procurador de Menores y Procurador de Familia.

 Esta clasificación la reconocemos y “la hacemos con pleno conocimiento de sus consecuencias [...]”. Reconocimos que “la discusión en los medios de nuestro país, no menos que en sus cafetines, hogares y foros afines, puede ser cruel en demasía. Tal es el precio de la igualdad y la libertad política, valores que subyacen la normativa consti-tucional en materia de difamación”. (Enfasis en el original). Cabrero v. Zayas, supra, pág. 788.

 Según hemos reconocido anteriormente, el requisito de referencia específica no exige que la publicación difamatoria mencione directamente el nombre de la persona que presenta su causa de acción. Más bien, existe una referencia específica cuando una publicación difamatoria “identifica específicamente al sujeto deman-dante cuando la audiencia o los receptores, correcta o erróneamente, pero razonable-mente, así lo comprenden”. Colón, Ramírez v. Televicentro de P.R., 175 DPR 690, 722 esc. 28 (2009).

 Véase Rodríguez et al. v. Hospital et al., 186 DPR 889 (2012) (Rodríguez Rodríguez, J., Op. concurrente y disidente).

 El cómputo llevado a cabo por el juez de instancia fue el siguiente:
“Fórmula: $3,333 x 7.40 = $24,664.00
$24,664 b ,]43 = $57,358.00
$57,358 x 300 = $172,075.00
Donde: $3,333.00 = al promedio de las compensaciones otorgadas en casos similares durante los años 1915, 1918 y 1921.
7.40 = al promedio del valor adquisitivo del dólar durante los años 1915, 1918 y 1921.
.43 = al poder adquisitivo del dólar a diciembre del año 2003.
300 = al % de aumento del nivel de vida en el año base 1940”. Sentencia del Tribunal de Primera Instancia, pág. 98 esc. 144, Caso Núm. AC-2007-66, Apéndice de la Apelación civil, pág. 000634.

 Nos dice el tratadista Amadeo-Murga que:
“Los daños a la reputación son una partida de daño moral separada de los de las angustias mentales en los casos en que esta pérdida tiene lugar y hay prueba de la misma. Se compensa la pérdida de la estimación por parte de otros lo que es distinto y separado de nuestra propia reacción y sufrimiento ante la difamación o el libelo y *237 aun ante la pérdida de la estimación por parte de otros”. A.J. Amadeo-Murga, El valor de los daños en la responsabilidad civil 2da ed., San Juan, Ed. Bosch, 2012, pág. 181.

 El panel de Tribunal de Apelaciones estuvo integrado por la jueza Rodríguez Oronoz, como jueza ponente, la jueza Bajandas Vélez y la actual Jueza Asociada del Tribunal Supremo Señora Pabón Charneco.

 Debido a la falta de estadísticas sobre Puerto Rico para los años anteriores a 1941, hemos decidido utilizar el valor del poder adquisitivo del dólar del consumi-dor en Estados Unidos para calcular la actualización. Reconocemos que el valor del poder adquisitivo del dólar del consumidor en Puerto Rico para los mismos años podría variar. Sin embargo, ante la falta de una fuente confiable de estadística para esos años, preferimos utilizar un dato comparable. Por otro lado, decidimos utilizar el valor del poder adquisitivo del dólar para el año 2012 en el ajuste por inflación por ser el último año natural del que se posee una estadística revisada.

 Benet v. Hernández, 22 DPR 494 (1915). El valor adquisitivo del dólar para 1915 es $9.90, que se multiplican por los $2,000 que se otorgaron como compensación para luego dividirlo entre $0.87. Este ajuste por inflación representa la cifra de $22,758.62.

 Rivera v. Martínez, 26 DPR 760 (1918). El valor adquisitivo del dólar para el 1918 es $6.63, que se multiplican por los $3,000 que se otorgaron como compensación para luego dividirlo entre $0.87. Este ajuste por inflación representa la cifra de $22,862.06.

 Franco v. Martínez, 29 DPR 237 (1921). El valor adquisitivo del dólar para el 1921 es $5.67, que se multiplican por los $5,001 que se otorgaron como compensación para luego dividirlo entre $0.87. Este ajuste por inflación representa la cifra de $32,592.72.

 Opinión del Tribunal, pág. 211 esc. 64.

 Si valoramos que los daños otorgados por la mayoría son los que debieron otorgarse al emitirse la Sentencia del Tribunal de Primera Instancia en el 2004, entonces, al menos, debería actualizarse al valor del dólar hoy. El valor adquisitivo del dólar para 2004 es $1.13, que se multiplican por los $350,000.00 otorgados por la mayoría de este Tribunal como compensación para luego dividirlo entre $0.87. Este ajuste por inflación representa la cifra de $454,597.70.